UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| AMERICAN MORTGAGE ACCEPTANCE | : | Case No. 10-12196 (MG) |
| COMPANY, | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

# DISCLOSURE STATEMENT FOR
## DEBTOR'S PLAN OF REORGANIZATION

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT OR AN AMENDED VERSION THEREOF WILL BE SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103
(860) 278-1150

Platzer, Swergold, Karlin Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas
New York, New York 10018
(212) 593-3000

Proposed Attorneys for the Debtor and
Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| AMERICAN MORTGAGE ACCEPTANCE | : | Case No. 10- |
| COMPANY, | : | |
| | : | |
| Debtor. | : | |
| | : | |

## DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
## FOR AMERICAN MORTGAGE ACCEPTANCE COMPANY

## I.   INTRODUCTION

**A.   The Plan.** On April 26, 2010 (the **"Petition Date"**), American Mortgage Acceptance Company (the **"Debtor"**), filed a voluntary petition under chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**). The Debtor has proposed and filed with the Bankruptcy Court its Plan of Reorganization dated April 26, 2010 (the **"Plan"**). A copy of the Plan is annexed hereto as Exhibit A. The Debtor is seeking confirmation of the Plan by the Court.

Under the Plan, the Debtor will transfer certain assets to Taberna Preferred Funding I, Ltd. ("Taberna") in satisfaction of Taberna's Claims against the Debtor. The Old Common Stock of the Debtor will be cancelled, and the Reorganized Debtor will issue the New Common Stock to C-III Capital Partners LLC ("C-III") in satisfaction of C-III's Claims against the Debtor. Any Administrative Claims, Allowed Tax Claims, Allowed Priority Non-Tax Claims and Allowed Unsecured Claims other than the Claims of C-III and Taberna will be paid in full under the Plan.

22123.000/500215.7

Holders of Equity Interests will receive no distribution under the Plan, all Equity Interests will be cancelled. The Debtor will maintain REIT status, and as soon as practicable after the Effective Date the Debtor will issue the New Preferred Shares to raise capital to fund ongoing operations.

As described herein, the Debtor believes that the only real alternative to the Plan is conversion of the Debtor's Case to a case under chapter 7 of the Bankruptcy Code. As described in Part VII of this disclosure statement, the Debtor believes that a chapter 7 would be more expensive and less efficient than the reorganization proposed by the Plan, and that Creditors would receive less in a chapter 7 case than they will receive under the Plan.

**B.** **This Disclosure Statement, Voting, and Confirmation Hearing.** This disclosure statement has been approved by an order of the Bankruptcy Court as containing "adequate information", as that term is defined in Bankruptcy Code section 1125, to enable the Debtor's Creditors to make an informed judgment about whether to accept or reject the Plan. However, the Bankruptcy Court has not passed upon the merits of the Plan or conducted a detailed inquiry into the contents of this disclosure statement, and neither this disclosure statement nor the order approving it should be construed as an approval or endorsement of the Plan by the Bankruptcy Court. Creditors are encouraged to read and carefully consider the entire disclosure statement. In addition, the Plan is an integral part of this disclosure statement. Accordingly, all members of voting Classes are urged to study the Plan carefully in conjunction with this disclosure statement in order to make an informed judgment about the Plan. Creditors also should consider consulting with their own legal counsel regarding the Plan.

This disclosure statement has been prepared in accordance with Bankruptcy Code section 1125 and not in accordance with federal or state securities laws or other nonbankruptcy law. Unless

-2-

expressly noted, any financial information contained in this disclosure statement has not been independently audited. Every effort has been made to ensure that the information contained in this disclosure statement is accurate. This disclosure statement and the information contained herein should be used solely to assist in deciding whether or not to vote in favor of the Plan.

**Unless otherwise defined herein, capitalized terms used in this disclosure statement shall have the meaning ascribed to such terms in the Plan.** The summaries of the Plan contained in this disclosure statement are qualified by reference to the Plan itself. If any inconsistency exists between this disclosure statement and the Plan, the terms of the Plan are controlling.

In order for the Plan to be confirmed, Bankruptcy Code section 1129(a) requires that each impaired Class of Allowed Claims or Equity Interests vote to accept the Plan, subject to certain exceptions. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims in that class, but for this purpose considers only those Creditors that actually cast ballots for acceptance or rejection of the plan. Creditors that fail to vote are not counted as either accepting or rejecting the plan. Only Classes of Claims that are "impaired" are entitled to vote to accept or reject the Plan. As set forth in Bankruptcy Code section 1124, a Class is "impaired" if the legal, equitable or contractual rights attaching to the Claims of that Class are modified by the Plan.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into account the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate

22123.000/500215.7

unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in Bankruptcy Code section 1129(b).

The Plan provides that if all of the applicable requirements of Bankruptcy Code section 1129(a), other than section 1129(a)(8) thereof (i.e., acceptance of the Plan by all impaired Classes), are met with respect to the Plan, the Debtor requests that the Bankruptcy Court, pursuant to Bankruptcy section 1129(b), confirm the Plan notwithstanding the requirements of Bankruptcy Code section 1129(a)(8). The Debtor believes that Taberna and C-III will vote to accept the Plan. Class 5 Equity Interests are deemed not to have accepted the Plan. Notwithstanding Class 5's deemed rejection of the Plan, the Debtor believes that the Plan may be confirmed in accordance with Bankruptcy Code section 1129(b) without amendment or modification. **THE DEBTOR WILL SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE.**

After carefully reviewing this disclosure statement, each holder of an Allowed Claim entitled to vote to accept or reject the Plan should vote on the enclosed ballot and return such ballot so that it is received by 5:00 p.m., New York time, on _____, 2010. Any ballot that does not indicate either an acceptance or a rejection of the Plan will not be counted toward determining acceptance or rejection of the Plan. A vote to accept or reject the Plan can only be made by proper submission of a duly completed and executed ballot. Any person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such person holds Claims.

**TO BE COUNTED, YOUR PROPERLY FILLED OUT AND EXECUTED BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR BY 5:00 P.M. NEW YORK TIME ON _____, 2010, UNLESS THIS SOLICITATION IS EXTENDED BY ORDER**

22123.000/500215.7

**OF THE BANKRUPTCY COURT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED. IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY TO ACCEPT OR REJECT THE PLAN AFTER CAREFULLY REVIEWING THE PLAN AND THIS DISCLOSURE STATEMENT.**

Ballots are to be sent to counsel for the Debtor at the following address:

Reid and Riege, P.C.
One Financial Plaza
Hartford, Connecticut 06103-2608
Fax No. (860) 240-1002
Attn: Eric Henzy, Esq.

If you wish to change or withdraw your vote after submission of a ballot, Federal Rule of Bankruptcy Procedure 3018(a) requires that you provide notice and show cause at a hearing before the Bankruptcy Court.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on _____, 2010, at _____ a.m., before the Honorable _____, United States Bankruptcy Judge, in Courtroom _____, at the United States Bankruptcy Court, One Bowling Green, New York, New York. The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served and filed on or before _____, 2010. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of an adjournment date made at the confirmation hearing or at any subsequently adjourned confirmation hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon:

Eric Henzy, Esq.
Carol A. Felicetta, Esq.
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103-2608
Attorneys for the Debtor

Cliff A. Katz, Esq.
Sherri D. Lydell, Esq.
Platzer, Swergold, Karlin Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas
New York, New York 10018
Attorneys for the Debtor

Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004
Att: Paul Schwartzberg, Esq.

Counsel for Committee, if any

on or before May __, 2010, at 5:00 p.m. Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014. Unless an objection is timely served and filed, it will not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met. The Debtor believes that the Plan meets the applicable requirements of Bankruptcy Code section 1129 (other than those pertaining to voting, which has not yet taken place) and will seek a ruling of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

**ALL PROJECTED RECOVERIES ARE MERELY ESTIMATES, BASED ON ASSUMPTIONS WHICH ARE SET FORTH IN THIS DISCLOSURE STATEMENT. TO THE EXTENT THAT ACTUAL RESULTS VARY FROM THE ASSUMPTIONS, RECOVERIES MAY VARY FROM THE ESTIMATES.**

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS. CREDITORS ARE URGED TO VOTE TO ACCEPT THE PLAN.**

## II. OVERVIEW OF THE PLAN

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. CREDITORS ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED BY THE PLAN ITSELF. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY BETWEEN A SUMMARY AND THE PLAN.

If the Plan is confirmed, on the Effective Date of the Plan the Debtor will pay in Cash all allowed Administrative Claims, Allowed Tax Claims, and Allowed Priority Non-Tax Claims and Allowed Unsecured Claims other than the Claims of Taberna and C-III. The Debtor will make the Effective Date distributions called for under the Plan.

The following table summarizes the classification and treatment of Allowed Claims and Equity Interests under the Plan. The amounts stated are the Debtor's best estimates. A more detailed discussion is set forth in Part V of this disclosure statement.

| Class and Estimated Amount of Claims in Class | Treatment Under the Plan |
|---|---|
| **Administrative Claims.** | Paid (1) in full, in Cash, on the later of (a) the Effective Date of the Plan and (b) the date of the entry of a |

|  |  |
|---|---|
|  | Final Order allowing and determining such Administrative Claim, or (2) on such other less favorable terms as may be agreed to by such Entity. |
| **Allowed Tax Claims.** | Paid (1) in full, in Cash, on the later of (a) the Effective Date and (b) the date of entry of a Final Order allowing and determining such Tax Claim, (2) deferred Cash payments in quarterly installments over a period ending not more than five years after the Petition Date, or (3) on such other less favorable terms as may be agreed to by such Entity. |
| **Class 1 - Allowed Priority Non- Tax Claims** | Paid in full, in Cash, on the later of the Effective Date and the date such Claim becomes an Allowed Claim or upon such other less favorable terms as may be agreed to by such Entity. |
| **Class 2 - Allowed Unsecured Claims of Taberna.** | On the Effective Date, Taberna will receive CMBS bonds KEYC 2007-SL1 D (CUSIP 49307RAF4), KEYC 2007-SL1 E (CUSIP 49307RAG2) and KEYC 2007-SL1 F (CUSIP 49307RAH0) and Taberna Capital Management, LLC will receive $100,000.00. |
| **Class 3 - Allowed Unsecured Claims of C-III.** | On the Effective Date, C-III will receive the New Common Stock of the Debtor. |
| **Class 4 - Allowed Unsecured Claims.** | Paid (1) in full, in Cash, on the later of (a) the Effective Date of the Plan and (b) the date of the entry of a Final Order allowing and determining such Claim, or (2) on such other less favorable terms as may be agreed to by such Entity. |
| **Class 5 – Equity Interests.** | No distribution on account of Equity Interests, Equity Interests will be canceled. |

## III.    THE DEBTOR AND THE CHAPTER 11 CASE

The Debtor was formed in 1991 as a Massachusetts business trust, and elected to be treated as a real estate investment trust ("REIT") under the Internal Revenue Code of 1986, as amended. The Debtor is managed pursuant to an Advisory Services Agreement (the "Advisory Agreement"), by Centerline/AMAC Manager Inc. The Debtor's business consists of investing in mortgage loans and other debt instruments secured by multifamily and commercial property throughout the United States. As of December 31, 2007, the Debtor owned assets worth $666,399,000. The Debtor financed the purchase of these assets with, among other sources, monies borrowed through

repurchase facilities and monies raised in the commercial real estate collateralized debt obligation ("CDO") market.

Beginning in 2007 and throughout 2008 and 2009, negative developments in the market for many types of mortgage products (including mortgage-backed securities) resulted in reduced liquidity for these types of financial assets. Widening credit spreads led to reduced values and the inability to find adequate financing for these assets. This resulted in an overall reduction in liquidity across the credit spectrum of mortgage products, presenting the Debtor with significant challenges in financing its business. As the credit markets declined, so did the CDO market, and the Debtor decided to temporarily suspend investment activity and not pursue a second CDO securitization. Throughout 2008 and 2009, the Debtor was able to repay approximately $135 million of secured debt to, among others, Citigroup and JP Morgan.

Due to the dramatic decline in asset values that occurred in 2008 and 2009 and the liquidation of assets to pay secured debt, as of the Petition Date the value of the Debtor's assets had fallen to approximately $7 million. The Debtor's only significant remaining Creditors are Taberna, which is owed approximately $25 million, and C-III, which is owed approximately $93 million.

In March of 2005 the Debtor issued to AMAC Capital Financing I, a Delaware Statutory Trust ("ACF"), the Junior Sub Note pursuant to that certain Junior Subordinated Indenture, dated as of March 16, 2005 (the "Indenture"). ACF issued 25,000 Floating Rate Preferred Securities (the "Preferred Securities") to Taberna, having a liquidation amount of $1,000.00 per Preferred Security, and representing an undivided beneficial interest in the assets of ACF. ACF issued 780 Floating Rate Common Securities (the "Common Securities") to the Debtor, having a liquidation amount of $1,000.00 per Common Security and representing an undivided beneficial interest in the assets of

ACF. Upon Confirmation of the Plan, ACF will be deemed dissolved in accordance with the trust agreement governing ACF and the Junior Sub Note will be deemed to have been distributed (i) to Taberna in the amount of $25,000,000.00, which represents the principal portion of the Junior Sub Note equal to the liquidation amount of the Preferred Securities, and (ii) the balance to the Debtor in the amount of $780,000.00, which represents the principal portion of the Junior Sub Note equal to the liquidation amount of the Common Securities. The Preferred Securities and the Common Securities will be deemed cancelled upon this distribution.

As of March 5, 2010, C-III purchased certain assets from Centerline Holding Company and various affiliates of Centerline Holding Company, including a promissory note from the Debtor dated June 30, 2007. C-III's Claims represent the amount outstanding under this note.

Prior to the commencement of the Debtor's case, the Debtor, Taberna, Centerline and C-III negotiated the terms of the Plan, which they believe will maximize the remaining value of the Debtor's assets. C-III, Taberna and Centerline each support confirmation of the Plan. As noted, the Debtor filed its chapter 11 petition on April 26, 2010. The Debtor filed the Plan on that same date.

## IV. THE PLAN

**THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE INFORMATION SET FORTH IN THE PLAN, WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.**

The key features of the Plan are the Debtor's transfer of certain assets to Taberna in satisfaction of Taberna's Allowed Unsecured Claims and the transfer of the New Common Stock to C-III in satisfaction of C-III's Allowed Unsecured Claims pursuant to the C-III Exchange Agreement (annexed hereto as Exhibit B). After the Confirmation Date, the Debtor will continue to operate its

22123.000'500215."

business. As the new owner of the Debtor, C-III will select new directors of the Debtor, who will in turn select new officers of the Debtor.

**A.** **Description, Classification and Treatment of Claims and Equity Interests.** Under the Plan, all Allowed Claims and Equity Interests are classified and treated as follows:

**1.** **Non-Classified Claims.**

**a.** **Administrative Claims.** Administrative Claims include, <u>inter alia,</u> the actual, necessary costs and expenses, incurred after the Petition Date and prior to confirmation of the Plan, of preserving the Debtor's property and operating the Debtor's business. Administrative Claims include post-petition fees and expenses due to Reid and Riege, P.C., and Platzer, Swergold, Karlin Levine, Goldberg & Jaslow, LLP, attorneys for the Debtor, and any other professionals retained in the Case. Administrative Claims are not classified under the Plan and the holders of Administrative Claims have no right to vote to accept or reject the Plan. The Debtor estimates that as of the Confirmation Date the total amount of unpaid Allowed Administrative Claims will not exceed approximately $100,000.00, including any amounts paid on an interim basis pursuant to Bankruptcy Court orders. Requests for payment of Administrative Claims not otherwise allowed must be filed and served on the Debtor by the date set by the Bankruptcy Court in the order setting the Confirmation Hearing. Under the Plan, each Entity holding an Allowed Administrative Claim shall be paid (1) in full in Cash on the later of (a) the Effective Date and (b) the date of the entry of a Final Order allowing and determining such Administrative Claim, or (2) on such other less favorable terms as may be agreed to by and among the Debtor and such Entity; <u>provided, however,</u> that Administrative Claims representing liabilities incurred by the Debtor in the ordinary course of its

business during the Case shall be paid by the Debtor in accordance with the terms and provisions of the particular transactions and agreements relating thereto.

   **b.     Allowed Tax Claims.**  Allowed Tax Claims consist of certain types of Allowed Unsecured Claims of governmental units which are entitled to priority under Bankruptcy Code section 507(a)(8). Allowed Tax Claims are not classified under the Plan and holders of Allowed Tax Claims have no right to vote to accept or reject the Plan. The Debtor estimates that as of the Confirmation Date the total amount of Allowed Tax Claims will be zero. Under the Plan, any Entity holding an Allowed Tax Claim shall receive, (1) at the option of the Debtor, (a) payment in full in Cash on the later of (i) the Effective Date of this Plan and (ii) the date of entry of a Final Order allowing and determining such Tax Claim or (b) deferred Cash payments in quarterly installments over a period ending not later than five years after the Petition Date of a total value, as of the Effective Date, equal to the amount of such Allowed Tax Claim, or (2) payment on such other less favorable terms as may be agreed to by and among the Debtor and such Entity.

   **2.     Classified Claims.**

   **a.     Classes 1 - Allowed Priority Non-Tax Claims.**  Class 1 consists of any Allowed Claims entitled to priority under Bankruptcy Code sections 507(a)(3), (4), (5), (6), (7) or (9). The Debtor estimates that as of the Confirmation Date, the aggregate amount of unpaid Allowed Priority Non-Tax Claims will be zero. This Class is not impaired under, and any holders of Class 1 Claims are conclusively presumed to have accepted, the Plan. Any Entity holding an Allowed Priority Non-Tax Claim shall be paid (1) in full in Cash on the later of Effective Date and the date such Claim becomes an Allowed Claim or (2) upon such other less favorable terms as may be agreed to by such Entity.

**b.      Class 2 – Allowed Unsecured Claim of Taberna.** Class 2 consists of the Allowed Unsecured Claims of Taberna in the approximate amount of $25,000,000.00, including Claims on account of the Junior Sub Note and the Preferred Securities. This Class is impaired under and is entitled to vote on the Plan. Under the Plan, in full and complete satisfaction of Taberna's Allowed Unsecured Claims, on the Effective Date the Reorganized Debtor will transfer to Taberna and Taberna will receive, free and clear of any claims, liens or other interests, CMBS bonds KEYC 2007-SL1 D (CUSIP 49307RAF4), KEYC 2007-SL1 E (CUSIP 49307RAG2) and KEYC 2007-SL1 F (CUSIP 49307RAH0). The Reorganized Debtor also will transfer $100,000.00 to Taberna Capital Management, LLC.

**c.      Class 3 – Allowed Unsecured Claim of C-III.** Class 3 consists of the Allowed Unsecured Claims of C-III in the approximate amount of $93,000,000.00. This class is impaired under and is entitled to vote on the Plan. Under the Plan, in full and complete satisfaction of C-III's Allowed Unsecured Claims, on the Effective Date the Reorganized Debtor will transfer to C-III and C-III will receive the New Common Stock from the Reorganized Debtor under and pursuant to the terms of the C-III Exchange Agreement.

**d.      Class 4 - Allowed Unsecured Claims.** Class 4 consists of all Allowed Unsecured Claims (Unsecured Claim is defined in the Plan as a Claim that is not a Secured Claim, an Administrative Claim, a Tax Claim, or a Priority Non-Tax Claim) other than the Allowed Unsecured Claims of C-III and Taberna. The Debtor estimates that as of the Confirmation Date, the aggregate amount of Class 4 Allowed Unsecured Claims will be zero, other than de minimis Claims of Centerline. This Class is not impaired under and is conclusively presumed to have accepted the Plan, and the Debtor is not required to solicit acceptances from any holders of any Claims in this

-13-

Class. In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Unsecured Claim, any Entity holding an Allowed Unsecured Claim will receive Cash equal to the Allowed amount of such Unsecured Claim, except to the extent that such holder of an Allowed Unsecured Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment. Centerline/AMAC Manager Inc. and Centerline Servicing LLC have agreed that they will receive no distribution under the Plan.

     **e.**     **Class 5 – Equity Interests.**  Class 5 consists of Equity Interests. This class is impaired under this Plan and is deemed not to have accepted this Plan pursuant to Bankruptcy Code section 1126(g). Equity Interests will receive no distribution and will not retain any property under the Plan. On the Effective Date Equity Interests will be canceled.

     **B.**     **Distributions.**  The Plan provides that the Reorganized Debtor shall make all distributions required by the Plan. All costs and expenses in connection with such distributions shall be borne by the Reorganized Debtor. The Plan provides that with respect to any Claim with respect to which a timely objection is filed (i.e., a Disputed Claim), no distribution shall be made to the holder of any such Disputed Claim until the entry of a Final Order or judgment determining the allowed amount of such Disputed Claim. Except as otherwise provided in the Plan, pending the time of such Final Order or judgment, to the extent that any sum otherwise becomes payable to the holders of Claims of the class to which the Disputed Claim belongs, there shall be deposited by the Reorganized Debtor an amount equivalent to that amount which would be payable to the holder of the Disputed Claim in the event that such Disputed Claim were allowed in the full amount asserted. Upon final determination of the allowed amount of the Disputed Claim, payment will be made to the holder of the Disputed Claim to the extent necessary to pay the allowed amount of such Claim.

22123.000/500215.7

**C.**     **Actions By Debtor and Issuance of New Preferred Shares.** The Plan provides that on the Effective Date, the following shall occur: (1) the Reorganized Debtor will make all distributions called for under the Plan and (2) the Reorganized Debtor will issue the New Common Stock to C-III under and pursuant to the terms of the C-III Exchange Agreement. Under the Plan, as soon as practicable, but not more than thirty days, after the Effective Date, the Reorganized Debtor will issue the New Preferred Shares. The Reorganized Debtor will maintain its REIT status.

**D.**     **Objections to Claims.** The Plan provides that from and after the Effective Date, the Reorganized Debtor shall be responsible for pursuing any objections to Claims. Objections to Claims, if any, with the exception of any Claim to which an objection may be filed under Bankruptcy Code section 502(d) (as to which Claims an objection need not be filed within the time period set forth hereinafter), shall be filed with the Bankruptcy Court and served upon each holder of a Disputed Claim on or before the 120th day after the Effective Date. The Reorganized Debtor shall have the right to petition the Bankruptcy Court for an extension of such date if a complete review of all Claims cannot be completed by such date.

Except as otherwise set forth in the Plan, objections to Claims which are not filed on or before the 120th day after the Effective Date are barred, precluded and may not be raised. The Plan provides that with respect to any Claim for which no objection is filed within such time, such Claim shall be deemed an Allowed Claim for the amount specified in a timely filed proof of Claim with respect to such Claim, or, if no timely filed proof of Claim exists, in the amount specified in the Schedules, unless the Claim was specified in the Schedules as being disputed, contingent or unliquidated. The Plan further provides that if no timely filed proof of Claim exists, and the Claim either (i) was not listed in the Schedules or (ii) was specified in the Schedules as being disputed,

contingent or unliquidated, the Claim shall be barred and no distribution shall be made thereon if the Creditor holding such Claim received proper notice of the Case.

The Plan provides that, for the avoidance of doubt, the Debtor acknowledges and agrees that it has no objection to any Class 2 Claim or any Class 3 Claim, and/or that any such objection is waived. Centerline/AMAC Manager Inc. and Centerline Servicing LLC have agreed that they will receive no distribution under the Plan on account of their Unsecured Claims and that such Claims will be extinguished by confirmation of the Plan.

**E.** **Assumption and Rejection.** The Plan provides that the Debtor will seek Bankruptcy Court approval to assume or reject any executory contracts or leases of nonresidential real property that have not been assumed or rejected as of the Confirmation Date. The Debtor will seek to assume any contracts or leases that have value or add value to other property of the Debtor. The Debtor will seek to reject any contracts or leases that are of no value to the Debtor and its estate. The Plan provides that Confirmation of the Plan will constitute the rejection of the Advisory Agreement, effective as of the Confirmation Date.

**F.** **Retention of Jurisdiction.** The Plan provides that notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case and any of the proceedings arising from, or relating to, the Case pursuant to Bankruptcy Code section 1142 and 28 U.S.C. section 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out. The Plan provides that the Bankruptcy Court shall retain jurisdiction for the following purposes: (a) to hear and determine any and all objections to the allowance, or requests for estimation, of Claims; (b) to consider and act

on the compromise and settlement of any Claim against, or cause of action on behalf of, the Debtor and the Debtor's estate; (c) to determine any and all applications pending on the Confirmation Date for the rejection and disaffirmance, assumption or assignment of executory contracts or leases and the allowance of any Claim resulting therefrom; (d) to enter such orders as may be necessary or appropriate in connection with the recovery of the Debtor's assets or property wherever located; (e) to hear and determine any and all applications for allowance of compensation and reimbursement of expenses; (f) to hear and determine any and all controversies, suits and disputes arising under or in connection with the interpretation, implementation or enforcement of the Plan and any of the documents intended to implement the provisions of the Plan; (g) to hear and determine any and all applications, adversary proceedings, contested matters and other litigated matters pending on the Effective Date or that may be commenced thereafter as provided in the Plan; (h) to hear and determine any applications to modify any provision of the Plan to the full extent permitted by the Bankruptcy Code; (i) to correct any defect, cure any omissions or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan; (j) to effectuate distributions under and performance of the provisions of the Plan; (k) to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar and related matters with respect to the Debtor relating to the administration of the Case, including, without limitation, matters involving federal, state and local taxes in accordance with Bankruptcy Code sections 346, 505 and 1146; (l) to determine such other matters and for such other purposes as may be provided in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; (m) to enforce all orders, judgments, injunctions, releases and rulings issued or

-17-

entered in connection with the Case or the Plan; (n) to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated; (o) to determine any other matter not inconsistent with the Bankruptcy Code; and (p) to enter an order closing the Case.

G.     **Effect of Confirmation.**     The Plan provides upon the occurrence of the Effective Date, the Debtor shall be discharged, effective immediately, from any Claim and any "debt" (as that term is defined in Bankruptcy Code section 101(12)), and the Debtor's liability in respect thereof shall be extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Debtor entered into or obligation of the Debtor incurred before the Confirmation Date, or from any conduct of the Debtor prior to the Confirmation Date, or that otherwise arose before the Confirmation Date, including, without limitation, all interest accrued and expenses incurred, if any, on any such debts, whether or not a proof of claim was filed or is deemed filed under Bankruptcy Code section 501, such claim is allowed under Bankruptcy Code section 502 or the Entity holding such Claim has accepted this Plan. Without limiting the foregoing, the Debtor shall be discharged from all debts in accordance with section 1141 of the Bankruptcy Code.

The Plan further provides that, except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date the Reorganized Debtor will be vested with all Estate Assets free and clear of all Claims, liens and Interests and may operate its business and may use, acquire or dispose of its assets free and clear of any restrictions imposed by the Bankruptcy Code or

the Bankruptcy Court. The Plan also provides that, based upon their substantial contribution, each of the Debtor's current and former officers, directors and employees shall be released from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or prior to the Effective Date in any way relating to, but solely to the extent relating to, the Debtor, the Case or the Plan, except for claims or liabilities (i) based upon fraud or wilful misconduct, (ii) in respect of any loan, advance or similar payment by the Debtor to any such person or (iii) in respect of any contractual obligation owed by such person to the Debtor. Under the Plan, Creditors and holders of Equity Interests are permanently enjoined from, and restrained against, commencing or continuing in any court or suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (a) the Debtor or the Reorganized Debtor, (b) the property of the Debtor or the Reorganized Debtor, or (c) any of the persons receiving releases as described above, liable for any claim, obligation, right, interest, debt or liability that has been discharged or released pursuant to the Plan.

      **H.**    **Modification and Withdrawal of the Plan.**  The Plan provides that the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order with the prior written consent of Taberna and C-III. After entry of the Confirmation Order, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan as provided in Bankruptcy Code section 11127, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim that has

accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder. The Plan also provides that the Debtor reserves the right to revoke and withdraw the Plan at any time before the Confirmation Date.

   **I.     Cancellation of Existing Securities and Agreements and Discharge of Trustees.**
The Plan provides that except for purposes of evidencing a right to distributions under the Plan or as otherwise expressly provided under the Plan, on the Effective Date all of the agreements and other documents evidencing Claims or Equity Interests, including, but not limited to, (i) the Amended and Restated Trust Agreement, dated as of March 16, 2005 (the "Trust Agreement"), among the Debtor, The Bank of New York Mellon Trust Company, National Association (formerly known as JPMorgan Chase Bank, National Association, "BNYM") as property trustee, BNY Mellon Trust of Delaware (formerly known as Chase Bank USA, National Association, "BNY Delaware") as Delaware trustee, and certain individuals (the "Administrative Trustees") as administrative trustees, (ii) the Indenture, between the Debtor and BNYM as trustee, (iii) the Preferred Securities issued by ACF to Taberna pursuant to the Trust Agreement, (iv) the Common Securities issued by ACF to the Debtor pursuant to the Trust Agreement, (v) the Junior Sub Note issued by the Debtor to ACF pursuant to the Indenture, and (vi) the Old Common Stock, shall be cancelled and cease to be of further effect.  The Plan also provides that on the Effective Date, any trustee under any such documents, including BNYM as property trustee under the Trust Agreement and as trustee under the Indenture; BNY Delaware as Delaware trustee under the Trust Agreement; and the Administrative Trustees, shall be discharged from any and all rights, liabilities, duties and obligations under such documents.

**J.      Taberna and The Debtor Treated as Owners of Junior Sub Note and Action By Trustees.** In accordance with Section 9.2(a) of the Trust Agreement, the Delaware statutory trust know as AMAC Capital Financing I, i.e., ACF, which issued the Preferred Securities to Taberna, shall be dissolved upon the occurrence of a Bankruptcy Event (as defined in the Trust Agreement) of the Debtor. Section 9.4 of the Trust Agreement provides that in the event of such a dissolution, ACF shall be liquidated by BNYM by distributing the property of ACF, i.e., the Junior Sub Note, to the holders of the Preferred Securities and the Common Securities. Therefore, the Plan provides that for all purposes of the Plan, including voting and distribution, Taberna and the Debtor will be treated as the owners of the Junior Sub Note and Taberna will be treated as owner of the Preferred Securities, as applicable, in accordance with the terms of the Trust Agreement and the Indenture. The Plan provides that, in addition, BNYM and BNY Delaware shall be deemed to have taken all actions necessary by them under the Trust Agreement and the Indenture to effectuate the provisions of the Plan, including all actions necessary to effectuate the cancellation of the Preferred Securities and the distribution of the Junior Sub Note and the liquidation of the trust established pursuant to the Trust Agreement. The Plan also provides that to the extent BNYM or BNY Delaware are owed any fees or expenses pursuant to the Indenture or the Trust Agreement, the Reorganized Debtor shall be responsible for the payment of such fees and expenses, and that to the extent that any such trustee fees and expenses exceed $10,000.00, Taberna shall reimburse the Debtor for such excess.

## VI.      CERTAIN FEDERAL TAX CONSEQUENCES

The implementation of the Plan may have significant and complex federal, state, local and foreign tax consequences for Creditors and holders of Equity Interests. No ruling from the United States Internal Revenue Service or any state, local or foreign taxing authority has been or will be

22123.000 500215.

sought or obtained with respect to any federal, state, local or foreign tax consequences of the Plan. The tax consequences for any particular Creditor may be affected by matters not addressed in this disclosure statement or in the Plan. For example, certain types of investors (including non-resident aliens, life insurance companies and tax-exempt organizations) may be subject to special rules not discussed below. In addition, the Internal Revenue Code ("IRC"), the Treasury Department's regulations promulgated thereunder, and interpretations of the IRC and Regulations by the IRS in its rulings and other announced positions and by the courts are continually subject to change. Thus, the potential tax consequences described below are general in nature, are not intended to be complete or detailed, and are subject to significant exceptions and uncertainties. The discussion below covers only certain of the federal income tax consequences associated with the implementation of the Plan. This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor which may modify or alter the consequences described herein. This discussion does not address state, local or foreign tax consequences.

IN THIS SECTION, AND IN THIS DISCLOSURE STATEMENT GENERALLY, THE DEBTOR AND ITS PROFESSIONALS DO NOT INTEND TO AND ARE NOT GIVING TAX OR OTHER LEGAL ADVICE TO ANY CREDITORS. THE DEBTOR ONLY PROVIDES THIS GENERAL INFORMATION TO ASSIST THE PARTIES INVOLVED IN EVALUATING HOW THE PLAN AFFECTS THEM FOR TAX PURPOSES. CREDITORS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES. NO RULING HAS BEEN REQUESTED

**FROM THE IRS AS TO TAX CONSEQUENCES OF THE PLAN. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IRS WOULD AGREE WITH THE FOLLOWING DISCUSSION.**

The federal income tax treatment of payments received by a Creditor in these Cases will vary depending on a number of factors, including the classification of the Creditor for tax purposes, the Creditor's method of accounting, the Creditor's tax residence, and the origin or genesis of the Creditor's claim. Thus, tax treatment will depend on whether the Creditor is an individual, a partnership or a corporation, whether the Creditor uses the cash method or the accrual method of accounting, and whether the Creditor is a foreign person for income tax purposes.

In general, a Creditor receiving a distribution under the Plan in satisfaction of a Claim will realize income, gain or loss measured by the difference between (i) the cash and the fair market value of property received under the Plan and (ii) the Creditor's adjusted tax basis in the Claim. The income, gain or loss realized by the Creditor will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or for the sale of goods or merchandise. Generally, the gain or loss will be capital gain or loss if the Claim is a capital asset in the Creditor's hands. The federal income tax consequences of a distribution under the Plan also will depend on the nature of the original transaction pursuant to which the Claim arose. For example, distribution on account of the principal amount due on a loan is not included in the Creditor's gross income, whereas distribution on account of interest on the loan or on account of rent is included in the Creditor's gross income to the extent it was not previously included in income.

The federal income tax consequences of a distribution to a Creditor also will depend on whether an amount representing the distribution has previously been included in the Creditor's gross income or whether the Creditor has previously claimed a loss or bad debt deduction for that amount. For example, if a distribution is made in satisfaction of an account or note receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or the sale of goods or merchandise, and the Creditor has previously included the amount of the distribution in its gross income under its method of accounting, and has not previously written off the account or note receivable, the receipt of the distribution would not result in additional income to the Creditor. On the other hand, if such Creditor had written off the account or note receivable in a prior year, the Creditor would have to treat the amount of the distribution as income.

Section 166 of the IRC permits a deduction for indebtedness that becomes wholly or partially worthless during a taxable year. In order to prove the worthlessness of the debt, the taxpayer must establish the existence of an "identifiable event" indicating worthlessness.

In general, holders of Equity Interests should recognize loss in an amount equal to their adjusted tax basis in their Equity Interests. Such loss generally will be capital loss, and will be long-term if their Equity Interest has been held for at least one year as of the Effective Date.

As a result of the implementation of the Plan, it is likely that there will be some amount of cancellation of debt ("COD") resulting in taxable income for the Debtor for federal income tax purposes. COD is the amount by which the debt cancelled (reduced by any unamortized discount) exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction). In general, the Internal Revenue Code

provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, tax credits, and tax basis in assets—by the amount of any COD. This reduction in tax attributes occurs only after the determination of tax for the taxable year in which the COD occurs. In general, to the extent the amount of excluded COD income exceeds the tax attributes available for reduction, the excess amount is excluded from gross income without any further current or future tax cost to the debtor.

## VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) dismissal of the Debtor's chapter 11 Case, (b) liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code, or (c) an alternative chapter 11 plan. The Debtor believes that the Plan is preferable to the alternatives described below because the Plan provides for an equitable, early distribution to the Debtor's Creditors and because any alternative to confirmation of the Plan would result in significant delays in and probable diminution of recoveries for Creditors.

**A.** **Dismissal of the Debtor's Chapter 11 Case.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's Case could be dismissed. The Debtor believes that dismissal of the Debtor's chapter 11 Cases would result in piecemeal liquidation of the Debtor's assets without Bankruptcy Court supervision. Such liquidation would, in the Debtor's opinion, generate substantially less for Creditors than the sums which will be realized under the Plan and result in inequitable recoveries among Creditors.

**B.** **Liquidation Under Chapter 7.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's Case could be converted to a case under chapter 7 of the Bankruptcy Code. If the Case were converted, a chapter 7 trustee would be elected or appointed to liquidate the

assets of the Debtor's estate and distribute the proceeds to Creditors in accordance with the priorities established under the Bankruptcy Code.

The Debtor believes that holders of Allowed Unsecured Claims would receive far less in a liquidation pursuant to chapter 7 than they would under the Plan. Immediate liquidation of the Debtor's assets would result in substantial diminution of their value. In addition, a chapter 7 trustee would receive a substantial commission for distributing the Debtors' assets. Because the amount of the Debtor's liabilities far exceed the value of the Debtor's assets, holders of Equity Interests would receive nothing in a chapter 7 case.

After consideration of the effect a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Debtor's Creditors, including increased costs and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and professional advisers to the trustee and the costs attributable to the time value of money resulting from what could be a protracted proceeding, the Debtor has concluded that Creditors will receive a larger distribution and receive distributions more quickly under the Plan than they would receive in a chapter 7 liquidation. Annexed hereto as Exhibit C is a liquidation analysis of the Debtor. From this analysis, it appears that, on liquidation, Creditors would receive less than they will receive pursuant to the Plan.

**C.** **Alternative Chapter 11 Plan.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor or any other party in interest could attempt to formulate an alternative chapter 11 plan or plans. The Debtor has explored various alternatives in connection with the formulation and development of the Plan, and believes that an alternative plan is not a realistic option in the facts and circumstances of this Case. As detailed herein, the Plan puts into effect the

agreements with Taberna and C-III, the Debtor's two major Creditors. These agreements are the product of extended, informed negotiations between the Debtor, Taberna, C-III and Centerline. The Debtor believes that holders of Allowed Unsecured Claims will not receive more, and likely would receive less, if a plan based on something other than the agreements were pursued. The Debtor believes that the Plan implements a fair resolution of all claims and that this proposal is in the best interests of holders of Allowed Unsecured Claims.

The Debtor believes that failure to confirm the Plan and formulation of a new plan would result in substantial expense and delay to the bankruptcy estate, and negatively impact the time and amount of distributions to Creditors, all for no good purpose. It is highly unlikely that a chapter 11 plan more favorable to Creditors than the Plan would be formulated. The Debtor believes that the Plan will enable Creditors to realize greater value under the circumstances than under any available alternative plan.

## VIII.   CONCLUSION AND RECOMMENDATION

The Debtor believes, for the reasons described herein and in the Plan, that the Plan offers Creditors the most favorable alternative under existing circumstances. **ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO ACCEPT THE PLAN.**

Dated at New York, New York, this 26th day of April, 2010.

AMERICAN MORTGAGE ACCEPTANCE COMPANY


By___/s/ Robert L. Levy_____
   Robert L. Levy
   Its President and Chief Executive Officer

22123.000/500215.7